**CIVIC CENTER REDEVELOPMENT CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 76–818 C (3).

United States District Court, E. D. Missouri, E. D.

Aug. 7, 1978.

Peter W. Herzog, Jr., and Gerald J. Zafft, Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., for plaintiff.

Angelo I. Castelli, Atty., U. S. Dept. of Justice, Tax Div., Washington, D. C., for defendant.

MEMORANDUM

NANGLE, District Judge.

Plaintiff Civic Center Redevelopment Corporation brought this suit seeking a re-

fund in federal income taxes and interest for the year 1971. At issue is the tax treatment to be applied to the sale in 1971 of a certain parcel of property.

This case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1) Civic Center Redevelopment Corporation [hereinafter "Civic Center"] was incorporated on September 17, 1959 as a Missouri Urban Redevelopment Corporation .in accordance with the provisions of Chapter 353, R.S.Mo. (1969).

2) On March 11, 1960, the City of St. Louis declared a certain area of land in the City to be blighted and determined pursuant to Ordinance 49822 that redevelopment under Chapter 353 R.S.Mo. (1969) was necessary and in the public interest. Because it was not economically feasible to proceed under Chapter 353, no redevelopment plan became effective pursuant to Ordinance 49822.

3) Land Clearance for Redevelopment Authority of the City of St. Louis, Missouri [hereinafter "LCRA"], previously incorporated as a Land Clearance for Redevelopment Authority in accordance with the provisions of Chapter 99, R.S.Mo. (1969), prepared and filed a proposed Redevelopment Plan, dated November 17, 1960. The City of St. Louis then declared the same area blighted by Ordinance 50113 and determined that redevelopment of the area under Chapter 99 was necessary and in the public interest. As LCRA had no source of funds available to it for this purpose, LCRA advertised for redevelopers to submit proposals for redeveloping this area. Each redeveloper would provide funds to LCRA to acquire the land and redevelop it.

4) On January 30, 1961, Civic Center submitted a redevelopment proposal pursuant to LCRA's proposed Redevelopment Plan and advertisement for proposals. LCRA's Redevelopment Plan was approved by Ordinance 50263, adopted March 8, 1961. Civic Center's redevelopment proposal was accepted and approved by Ordinance 50373, adopted March 8, 1961.

5) The Redevelopment Plan submitted by LCRA as approved provided, inter alia, for the construction of a modern stadium of approximately 50,000 seat capacity over a several block area between Broadway, Seventh, Walnut and Spruce Streets. All of those streets, with the exception of Spruce Street, were to be curved around the stadium in such a fashion as to decrease the previous size of the potential redevelopment sites on the lots opposite the stadium. City Blocks 103, 104 and 105 were among those sites so decreased. These blocks were required to be developed with a parking garage, accommodating approximately 2100 cars. The Plan further provided for the construction of an unspecified number of multi-level parking structures with an aggregate of approximately 7400 parking spaces and a motel of approximately 800 rooms which could be constructed in two or more stages. Civic Center, as the approved redeveloper, became obligated to construct the stadium, parking structures and motel upon acceptance of its redevelopment proposal in accordance with LCRA's Redevelopment Plan.

6) The Redevelopment Plan, as approved by the City of St. Louis, required a contractual arrangement between LCRA and Civic Center, and a contractual arrangement among the City of St. Louis, LCRA and Civic Center. LCRA and Civic Center entered into an agreement, dated July 13, 1961, as required by Ordinance 50373. Pursuant to this agreement, LCRA was to commence the acquisition of land within the stadium project area upon written instructions from Civic Center. Upon completion of acquisition and site clearance, LCRA was to convey such property to Civic Center either by lease or by deed, as designated by Civic Center. The Agreement further provided the mechanics of Civic Center's fi-

nancing of the acquisition of land within the stadium project area by LCRA and the manner of accounting between the two. The Agreement provided that LCRA would manage all properties acquired in the stadium project area prior to conveyance to Civic Center by deed or lease and that any net income therefrom would be deposited in LCRA's "Debt Reduction Account, Stadium Project", and would be used to reduce the amount that Civic Center was required to pay to LCRA upon delivery of the deed to the parcels so acquired.

7) The City of St. Louis, LCRA and Civic Center entered into a Tri-Partite Agreement, dated August 28, 1962 as required by the Redevelopment Plan and authorized by Ordinance 50373. Pursuant to this agreement, the City constructed certain basic improvements in the stadium project area such as bus parking lot, streets, sidewalks, etc. LCRA acquired, cleared and prepared for redevelopment the stadium project area with funds furnished by Civic Center or from borrowings guaranteed by Civic Center and agreed to convey the land so acquired to Civic Center by deed or, at Civic Center's election, by lease for a period not to exceed the term of repayment of any loan secured by a deed of trust on said land, with the proviso that LCRA would deliver a deed to such land to Civic Center at the earlier of the expiration of the lease term or the release of the land from said deed of trust, upon payment to LCRA of its costs. Finally, Civic Center agreed, inter alia, to advance or guarantee the availability to LCRA of all funds necessary to finance acquisition of the land in the stadium project area and to accept promptly, by deed or lease as mutually agreed by LCRA and Civic Center, conveyance from LCRA of each part of the project when such portion was cleared and improved for redevelopment. By mutual consent, such conveyance may have been made prior to such clearance and improvement for redevelopment. Civic Center could, at its election, in lieu of taking conveyance by deed, lease any or all of the sites from LCRA, such leases to be for the period of repayment of mortgage loan incurred for the acquisition or redevelopment of such sites, conveyance by deed of such sites to be made by LCRA to Civic Center upon the payment of the mortgage loans and upon the reimbursement of LCRA by Civic Center in full for all costs incurred by LCRA in connection with such sites.

8) In June of 1961, Civic Center negotiated a loan commitment from Equitable pursuant to which Equitable agreed to loan Civic Center up to $33,500,000.00 which loan could be drawn down from time to time as needed. The monies so drawn down were to be secured by deeds of trust upon the property to be acquired pursuant to the Redevelopment Plan.

9) Civic Center proceeded to raise the capital necessary for the design and construction of the stadium, parking garages and motel, as required by the Redevelopment Plan. Civic Center sold over $20,000,-000.00 of stock and debentures and drew upon part of the $33,500,000.00 loan from Equitable, securing the same by deed of trust on a substantial part of the land in the stadium project area, including City Block 103.

10) Upon the acquisition of City Block 103 in 1963, LCRA cleared the same and operated it as a surface parking lot. LCRA received income from the operation of the parking lot and deposited the net income after expenses in its "Debt Reduction Account, Stadium Project", as required by the Operating Agreement.

11) Due to the proposed encroachment by the curving of Broadway upon City Blocks 103, 104 and 105, the original Redevelopment Plan anticipated that City Blocks 103, 104 and 105 would all be necessary for the construction of a 2100 space garage. When the final plans for the stadium were developed, however, the configuration of the stadium was altered in such a manner that it was no longer necessary to curve Broadway, permitting the restoration of the original dimensions of City Blocks 103, 104 and 105. These alterations permitted the construction of a 2800-space garage upon City Blocks 104 and 105; it was not necessary to

build any part of the parking garage upon City Block 103.

12) LCRA prepared and filed a revised Redevelopment Plan, dated July 20, 1965, amending the prior Redevelopment Plan. The City of St. Louis approved the revised Redevelopment Plan on December 20, 1965 by Ordinance 53744. The approved revised Redevelopment Plan removed the required use of City Block 103 as part of the parking garage and authorized a commercial use of that parcel. Additionally, City Blocks 106, 107 and 108 were added to the stadium project area.

13) In 1965, Equitable revised its loan commitment to Civic Center to provide for the development of City Block 103 in accordance with the revised Redevelopment Plan.

14) Civic Center continued to develop the stadium, four parking garages providing over 7400 spaces and commercial space on the ground level of two of the garages, and an 800-room hotel, all pursuant to the revised Redevelopment Plan. Civic Center, from the time of initial development through 1971, the year in question herein, has owned and operated the stadium; has owned and operated two of the parking garages comprising approximately 5000 parking spaces; has owned and leased two of the smaller parking garages; and has owned and leased the hotel to Stouffer's. In addition, Civic Center leases the ground upon which the Spanish Pavilion was erected and has owned and leased the ground on which the First National Bank Drive-In Facility is located.

15) In 1965 and 1966, Civic Center attempted to interest Equitable in being the prime lessee and/or tenant in a proposed office building to be built by Civic Center, according to Equitable's specifications, on City Block 103. Equitable, however, declined to participate in the development.

16) In 1966 and 1967, Civic Center negotiated with a St. Louis real estate company, Cornet & Zeibig, to join with Civic Center in a joint venture to construct an office building on City Block 103. Preliminary financial statements were prepared by Cor-net & Zeibig and were submitted to Civic Center. No final agreement, however, was ever reached between the parties.

17) Following the collapse of negotiations with Cornet & Zeibig, Civic Center again attempted to negotiate with Equitable to obtain financing to construct an office building on City Block 103. It was proposed that Civic Center would lease the office building, once completed, to a lessee approved by Equitable. Civic Center and Equitable in fact entered into an agreement in principle on or about April 2, 1968, for construction of an office building on City Block 103, which agreement called for Civic Center to be the developer and owner, and for a Raymond Wittcoff to be the lessee. In August 1968, however, Equitable determined that it preferred to upgrade the architectural plans previously submitted and to develop the proposed building as an "Equitable Building"; Equitable offered to buy City Block 103 and the building from Civic Center once construction was completed.

18) Equitable then proceeded to settle with the previously proposed lessee, Raymond Wittcoff. Civic Center agreed to acquire and to convey to Equitable title to the land and building upon completion of the construction. On October 24, 1968, Civic Center, Equitable and Stadium Plaza Redevelopment Corporation [hereinafter "SPRC"], a wholly-owned subsidiary of Civic Center, entered into an agreement, providing for the acquisition of fee simple title to City Block 103 by Civic Center by deed from LCRA, the leasing of the same by Civic Center to SPRC, the construction of the Equitable Building by SPRC, the financing of such construction as directed by Equitable, and the sale to Equitable, upon completion of the construction, of either the stock of SPRC or City Block 103, with improvements, as determined by Equitable.

19) Pursuant to this agreement, Civic Center acquired fee simple title to City Block 103 by Quit Claim Deed from LCRA on July 29, 1969 and Civic Center then leased City Block 103 to SPRC for a 99-year term.

20) SPRC and Equitable signed a building contract agreement with Fruin-Colnon Corporation, as general contractor, on July 29, 1969, which provided for the payment to the contractor of the cost of construction, with a guaranteed price, plus the payment of a fixed fee to the contractor. SPRC arranged to borrow the entire cost of construction from the First National Bank in St. Louis; Equitable guaranteed the loan.

21) Fruin-Colnon commenced construction of the building. All change orders and payments of authorized draws had to be and were approved by Equitable. In May, 1971, the Equitable building was substantially completed. The sale to Equitable was closed on May 20, 1971. At closing, Civic Center delivered its quit claim deed, dated May 20, 1971 to Equitable. Equitable paid $2,240,000.00 to Civic Center less adjustments for ground rent and for a deposit previously paid. Thus, a net of $2,232,611.11 was paid. Additionally, Equitable acquired the leasehold estate from SPRC for a purchase price in an amount equal to the approved cost of the project, that is, the balance due on the construction loan from First National, in the amount of $14,716,696.64, which amount Equitable paid directly to First National.

22) Civic Center never advertised City Block 103 or any other property in the Stadium Project Area for sale and never listed any property for sale with any real estate agent or broker. Civic Center never solicited offers to purchase City Block 103 or any other property in the Stadium Project Area.

23) Civic Center had also attempted to develop City Blocks 79 and 80. After attempting to interest Pet, Inc. in a lease arrangement, Civic Center finally agreed to sell the property to Pet. In 1964, Civic Center and Pet formed Helvetia Redevelopment Corporation, with Civic Center owning 28% of the stock and Pet owning 72%. Helvetia leased City Blocks 79 and 80 from Civic Center, who had acquired title by quit claim deed from LCRA. Helvetia entered into a construction contract for the construction of the Pet Headquarters building.

Upon completion of the building in 1969, Civic Center sold its stock in Helvetia to Pet and reported the gain thereon as a long-term capital gain.

24) Civic Center also attempted to develop City Block 185 on an equity basis but was unsuccessful. Accordingly, in January, 1974, Civic Center entered into a sales contract with General American Life Insurance Company pursuant to which Civic Center agreed to construct an office building for General American and to sell City Block 185 with improvements to General American upon completion of construction. Construction was completed in 1977 and City Block 185, with improvements was sold to General American in that year.

25) As of December 31, 1977, Civic Center held approximately 8.6 acres for future development and had sold approximately 7.7 acres to Pet, Equitable and General American.

26) As of December 31, 1977, Civic Center had received $4,733,380.00 from the sales of property to Pet, Equitable and General American. Since 1965, Civic Center had received net income of $62,722,000.00. The total proceeds from the sales represent approximately 7.5% of net income for the period 1965 through 1977.

27) Civic Center's total investment in the land sold to Pet, Equitable and General American was approximately $1,961,000.00. Civic Center's total investment in the Stadium Project Area, through 1977, was approximately $61,000,000.00. Civic Center's investment in the assets sold was approximately 3.2% of its total investment in the Stadium Project Area.

28) On March 15, 1972, plaintiff filed a U.S. Corporation Income Tax Return, Form 1120, for the calendar year 1971. Plaintiff paid to defendant, and defendant collected and assessed, federal income tax in the amount of $185,070.96, representing one-half of the tax shown to be due by the aforesaid 1971 income tax return. On June 15, 1972, plaintiff paid to defendant, and defendant collected and assessed, federal income tax in the amount of $185,070.95, representing the balance of the tax shown to be due by the aforesaid 1971 tax return.

29) On November 12, 1975, defendant assessed against plaintiff additional federal income tax for the calendar year 1971 in the amount of $145,378.15 and interest in the amount of $33,534.56. On November 24, 1975, plaintiff paid to defendant, and defendant collected, the additional federal income tax assessed.

30) On January 2, 1976, plaintiff filed a timely claim for the calendar year 1971 requesting a refund of the additional assessment of federal income tax and interest. More than six months have expired from the date of the filing of said claim to the date of the filing of the complaint herein.

31) From the evidence adduced, the Court finds that Civic Center was in the business of developing a specified area of land in the City of St. Louis. Such development was to be accomplished through leasing arrangements if possible; if such was not possible, however, Civic Center was prepared to sell the property in its effort to develop the same.

## CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter and the parties to this suit in accordance with 28 U.S.C. § 1346.

Title 26 U.S.C. § 1201 gives favorable tax treatment to capital gains. By virtue of 26 U.S.C. § 1222, the capital gain must result from the sale or exchange of a capital asset held for more than six months. Capital asset is defined in 26 U.S.C. § 1221 and excludes:

. . . property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business
. . . . .

■ Since capital gains treatment represents an exception to the general tax liability, it is to be construed narrowly. *Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955); *Malat v. Riddell*, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). The purpose of this favorable tax treatment is that:

Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment . . . applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions". [Cite omitted] *Corn Products Refining Co., supra* 350 U.S. at 52, 76 S.Ct. at 24.

■ The issue before the Court, whether the sale of City Block 103 was a sale of property held by Civic Center primarily for sale to customers in the ordinary course of its business, is basically a factual one. *Patterson v. Belcher*, 302 F.2d 289 (5th Cir. 1962); *Jersey Land and Development Corporation v. United States*, 539 F.2d 311 (3d Cir. 1976). Among the factors to be considered are

The purpose for which the property was originally acquired; the activities of the seller, or those acting with him or on his behalf, with respect to the improvement and actual disposition of the land, the frequency and continuity of sales; and the purposes for which the property was held during the taxable years. *Bauschard v. Commissioner of Internal Revenue*, 31 T.C. 910, 916 (1959).

See also *Howell v. Commissioner of Internal Revenue*, 57 T.C. 546, 554 (1972) considering also the extent of improvements made to the property and the proximity of sale to purchase. Accord, *Adam v. Commissioner of Internal Revenue*, 60 T.C. 996 (1973).

■ From the facts as found by this Court, it is clear that Civic Center is not entitled to capital gains treatment for the sale of City Block 103. Civic Center's business was the redevelopment of a specific area of the city of St. Louis. While it preferred to redevelop the same by means of leasing arrangements, it is clear that Civic Center sold property when that was

the only feasible means of redevelopment. With specific reference to City Block 103, it was acquired by Civic Center at a time when the agreement to resell it to Equitable had already been made. Extensive improvements were made to the property and the property was sold shortly after it was acquired. See *McFeely v. Commissioner of Internal Revenue*, 296 U.S. 102, 107, 56 S.Ct. 54, 80 L.Ed. 83 (1935); *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824 (1936); *Jersey Land and Development Corporation, supra* at 315; *Heebner v. Commissioner of Internal Revenue*, 32 T.C. 1162 (1959).

Accordingly, the Court must conclude that plaintiff is not entitled to judgment herein. Appropriate orders will be entered.